IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| CRICUT, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>ENOUGH FOR EVERYONE, INC., a Nevada corporation, and DESIRÉE TANNER, an individual,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO CORRECT PATENT INVENTORSHIP<br><br><br>Case No. 2:21-CV-00601-TS-DAO<br><br>District Judge Ted Stewart |

This matter is before the Court on the Defendant Desiree Tanner's Motion to Correct Patent Inventorship under 35 U.S.C. § 256(b).[1] For the reasons discussed below, the Court will deny Defendant's Motion.

I. BACKGROUND

This case involves unjust enrichment and other claims relating to royalty agreements between Plaintiff Cricut, Inc. ("Cricut") and Defendants Desiree Tanner ("Tanner") and Enough for Everyone.[2] Tanner is named as an inventor in all seven design patents at issue in this case and has been receiving royalty payments according to an agreement between the parties. At issue in the Motion are two utility patents (the "'259 patent" and "'366 patent") that involve machines related to the design patents for which Tanner is a named inventor.[3]

Tanner filed a Motion to Correct Patent Inventorship on June 21, 2023, requesting that she be added as a co-inventor for the two utility patents involving the original version of Cricut's

---

[1] Docket No. 113.

[2] Docket No. 2.

[3] Docket No. 113, at 3–4.

electronic cutting machines.[4] Tanner argues that she was omitted from the '259 and '366 patents by the error of Robert Workman, then-CEO of Provo Craft (which later became Cricut), due to his misunderstanding of the inventorship standard. Tanner claims that she conceived of the idea for the at-home cutting machines at a trade show that likely took place in the fall of 2004.[5] Tanner points to the fact that she was named as an inventor in the provisional applications for the design *and* utility patents related to the cutting machines as further evidence that she was improperly omitted as an inventor on the utility patents.[6]

Cricut filed a response on July 14, 2023, arguing that the Motion should be denied because (1) Workman conceived of the idea; (2) Tanner lacked the engineering experience and skills to conceive of the definite and permanent ideas necessary for inventorship; (3) the ideas Tanner alleges she conceived were already in the prior art; and (4) Tanner's claim to be named an inventor came too late and is therefore barred by patent laches.[7] On August 17, 2023, Tanner filed a reply, reiterating the arguments in her Motion and arguing that Cricut's Response included new evidence that was not in discovery.[8]

## II. DISCUSSION

*B. Patent Laches*

The Court will first address Cricut's assertion that Tanner's inventorship claim is barred by patent laches. "Laches is an equitable defense that may bar an inventorship claim."[9] "To

---

[4] *Id.* at 1.
[5] *Id.* at 7.
[6] *Id.* at 3.
[7] Docket No. 138, at 1–2.
[8] Docket No. 176.
[9] *Serdarevic v. Advanced Med. Optics, Inc.*, 532 F.3d 1352, 1358 (Fed. Cir. 2008).

prevail on a defense of laches, a defendant must establish that (1) the plaintiff's delay in filing a suit was 'unreasonable and inexcusable'; and (2) the defendant suffered 'material prejudice attributable to the delay.'"[10]

"[A] delay of more than six years after the omitted inventor knew or should have known of the issuance of the patent will produce a rebuttable presumption of laches."[11] "The relevant inquiry for the laches presumption is whether more than six years passed between the time when the inventor knew or should have known of the subject patent and the time the inventor initiated litigation."[12] The presumption of laches applies here. The '259 patent was issued on December 7, 2010,[13] and the '366 patent was issued on February 11, 2014.[14] Tanner did not seek to correct inventorship until December 2022.[15] The presumption of laches may be rebutted if the plaintiff offers "'evidence to show an excuse for the delay or that the delay was reasonable' or by offering evidence 'sufficient to place the matters of evidentiary prejudice and economic prejudice genuinely at issue.'"[16]

"[W]here the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry."[17] "Knowledge or

---

[10] *Lismont v. Alexander Binzel Corp.*, 813 F.3d 998, 1003 (Fed. Cir. 2016) (quoting *A.C. Aukerman v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992)).

[11] *Serdarevic*, 532 F.3d at 1358 (quoting *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 988 F.2d 1157, 1163 (Fed. Cir. 1993)).

[12] *Lismont*, 813 F.3d at 1003.

[13] Docket No. 114-12.

[14] Docket No. 114-13.

[15] Docket No. 65.

[16] *Serdarevic*, 532 F.3d at 1359–60 (quoting *Aukerman*, 960 F.2d at 1038).

[17] *James v. J2 Cloud Servs. Inc.*, No. 2:16-cv-05769, 2019 WL 2304157, at *7 (C.D. Cal. May 29, 2019) (quoting *Advanced Cardiovascular*, 988 F.2d at 1162).

notice to an attorney acquired during the existence of the relationship of attorney and client, and while acting within the scope of his authority, is imputed to the client."[18]

Tanner argues her "loose awareness of design patents naming her and Workman as co-inventors simply does not equate to knowledge of utility patents naming only Workman, and not Tanner."[19] However, Tanner acknowledged her awareness that Cricut had patents, that she had sold patents to Cricut, and that she wanted her lawyers to investigate her patent rights in a June 27, 2011, email to Workman.[20] Following that email, Tanner brought an action in California in August 2011 concerning the same subject matter as the present case.[21]

Tanner further relies on her inclusion in the provisional applications for the '259 and '366 patents as evidence she should be credited as an inventor on the utility patents. The provisional applications for the '259 and '366 patents were filed on July 13, 2006, and September 1, 2011, respectively.[22] In *Lismont*, the Federal Circuit upheld the district court's application of laches where "[the plaintiff] was aware that [the defendant] had filed a U.S. patent application covering the manufacturing method he allegedly invented before the [] patent issued."[23]

Like the plaintiff in *Lismont*, Tanner knew, or should have known, of the patent applications at least as early as 2011 when she hired an attorney to investigate her patent rights.

---

[18] *Immunoconcept, LLC v. Fulbright & Jaworski, LLP*, 504 F.3d 1281, 1287 (Fed. Cir. 2007) (quoting *Gulf Atl. Life Ins. Co. v. Hurlbut*, 749 S.W.2d 96, 98 (Tex. App. 1985)) (concluding that a party who obtained patent counsel to investigate patent rights was charged with what the attorney should have discovered on reasonable investigation).

[19] Docket No. 176, at 21.

[20] Docket No. 138-6, at 2.

[21] Docket No. 138-10.

[22] Docket No. 113, at 2. The '366 patent was not filed until September 1, 2011, but claimed priority to an earlier application that was filed on July 13, 2006.

[23] *Lismont*, 813 F.3d at 1003 (concluding that "[the plaintiff] should have filed his United States inventorship litigation within six years of . . . the date on which the patent issued.").

Her petition to this Court to amend the patent inventorship comes well after the provisional applications and more than a decade after the initial litigation concerning Tanner's patent rights. Given this evidence, along with the presumption of laches, the Court finds that her claim is barred by patent laches.

*C. Correction of Inventorship*

Even if Tanner's claim was not barred by patent laches, it fails because Tanner fails to show, by clear and convincing evidence, that she is entitled to an amendment of patent inventorship.

Under 35 U.S.C. § 256(b), a patent which, in error, omits inventors can be corrected by order of "[t]he court before which such matter is called in question."[24] The court may order correction "when it determines that an inventor has been erroneously omitted from a patent."[25] "The named inventors are presumed correct, and the party seeking correction of inventorship must show by clear and convincing evidence that a joint inventor should have been listed."[26] The heightened clear and convincing evidence standard is imposed to "respond[] to some plaintiffs' temptation 'to reconstruct, in a manner favorable to their own position, what their state of mind may have been years earlier,' or 'to reconstruct so as to further their own position, the extent of their contribution to the conception of the invention.'"[27]

For the court to order the patent corrected, "an alleged co-inventor must supply evidence to corroborate [their] testimony," and the alleged co-inventor's "testimony standing alone is

---

[24] 35 U.S.C. § 256(b).

[25] *Blue Gentian, LLC v. Tristar Prods., Inc.*, 70 F.4th 1351, 1357 (Fed. Cir. 2023).

[26] *Id.* (citing *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004)).

[27] *Scott v. Zimmer, Inc.*, 889 F. Supp. 2d 657, 662 (D. Del. 2012) (citing *Hess v. Adv. Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997)).

insufficient to establish inventorship by clear and convincing evidence."[28] All "pertinent evidence" must be evaluated, and "[a] 'rule of reason' analysis is applied to determine whether the inventor's prior conception testimony has been corroborated."[29]

The joint inventorship doctrine in 35 U.S.C. § 116 "provides that a person not listed on a patent need not demonstrate that he made a contribution equal in importance to the contribution made by the listed inventors to claim his right to joint inventor status."[30] "However, a long line of decisions . . . holds that a person is a joint inventor only if he contributes to the conception of the claimed invention."[31] In order "

> [t]o establish joint inventorship, a joint inventor must: (1) contribute in some significant manner to the conception or [r]eduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors, well-known concepts and/or the current state of the art.[32]

As a preliminary issue, Tanner argues in her reply that Cricut included new evidence in its Response to the Motion that was not producedin discovery. Under Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Tanner argues

---

[28] *Id.* (quoting *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1461 (Fed. Cir. 1998)) (holding that "an alleged co-inventor must supply evidence to corroborate his testimony" of conception).

[29] *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed. Cir. 1993).

[30] *Eli Lilly & Co.*, 376 F.3d at 1358 ("[S]ection 116 sets no explicit lower limit on the quantum or quality of inventive contribution required for a person to qualify as a joint inventor.") (internal quotation marks and citation omitted).

[31] *Id.* at 1358–59.

[32] *Pro Mktg. Sales, Inc. v. Securion Sys., Inc.*, No. 1:19-cv-00113-DBP, 2021 WL 1987192, at *4 (D. Utah May 17, 2021) (quoting *Opternative, Inc. v. JAND, Inc.*, No. 17 Civ. 6936 (JFK), 2018 WL 3747171, at *8 (S.D.N.Y. Aug 7, 2018)).

that the five inventor declarations and the attached documents included in Cricut's response should be excluded because they were not produced during discovery, and the Court previously denied Defendants' request to depose the inventors after the discovery deadline closed.[33]

At the time of Defendants' request to conduct additional depositions, they had made no attempt to conduct any depositions, despite their awareness of the named inventors, and the Court found that they failed to show that ten depositions were insufficient when they had not yet conducted any depositions.[34] While the Court denied additional depositions at that time, Defendants were granted an extension of time for fact discovery.[35]

After Tanner filed the Motion to Correct Patent Inventorship, Cricut filed an opposition supported by five of the named inventors.[36] Defendants again sought an extension of their reply deadline and leave to depose the five inventor declarants.[37] The Court denied Defendants' request because Defendants were aware of the inventorship issue and the identities of the named inventors, chose to depose only one of the named inventors, and were not diligent in pursuing the other inventor depositions.[38]

Additionally, there is no indication in the record that Cricut had the inventor declarations during discovery and waited to produce them. Instead, Cricut obtained the declarations and the attached documents in response to Tanner's Motion.

---

[33] *See* Docket No. 173.
[34] Docket No. 74, at 3–5.
[35] *Id.* at 2; Docket No. 75.
[36] Docket No. 173, at 4.
[37] *Id.* at 4–5.
[38] *Id.* at 6–8.

The production of the inventor declarations and related documents, to the extent it was untimely, is therefore harmless and can properly be considered. Tanner cannot blame Cricut for her own lack of diligence during discovery, especially since the question of inventorship has been long known to the parties.

    i.    <u>Invention of the Cutting Machine</u>

"A joint invention is the product of a collaboration between two or more persons working together to solve the problem addressed."[39] "[35 U.S.C. § 116] does not set forth the minimum quality or quantity of contribution required for joint inventorship."[40] Each joint inventor, however, must contribute "in some significant manner" to the conception of the invention.[41]

"Conception is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation."[42] "[T]he test for conception is whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention."[43] This conception is proved by corroborating evidence, "preferably by showing a contemporaneous disclosure."[44] In order for the idea to be considered definite and permanent,

---

[39] *Burroughs Wellcome Co. v. Barr Lab'ys, Inc.*, 40 F.3d 1223, 1227 (Fed. Cir. 1994) (citations omitted).

[40] *Id.*; *see also* 35 U.S.C. § 116.

[41] *Pro Mktg. Sales, Inc.*, 2021 WL 1987192, at *4; *see also Coda Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1359 (Fed. Cir. 2019) ("As to joint inventorship, a joint inventor must contribute to the invention's conception.").

[42] *Burroughs*, 40 F.3d at 1228.

[43] *Id.*

[44] *Id.*

the inventor must have "a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he [or she] hopes to pursue."[45]

Tanner alleges that she conceived of the idea for the electronic cutting machine while attending a trade show with Workman and other Provo Craft (n/k/a Cricut) personnel in the fall of 2004.[46] She states that she conceived the idea of making a smaller, at-home version of the industrial scale machines being displayed at the show, as well as the idea for certain specific features, including: integrated handles for carrying; detachable cartridges for design content; and a user interface that combines a fixed keyboard with removable keyboard overlays, customized for each cartridge, for selecting content from the cartridge and optional enhancements.[47]

Tanner also points to the provisional application on which she is a named inventor.[48] The appendix of the provisional application included materials about the keyboard overlays, which Tanner states she created for the benefit of the artists she was supervising.[49] She argues that "[t]he provisional patent application's incorporation of Tanner's work product, including product dealing extensively with the keyboard overlay, further corroborates her inventorship."[50]

"[T]he case law is unequivocal that an inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof."[51] "[O]ral testimony by an alleged inventor asserting priority

---

[45] *Id.*; *see also Fiers v. Revel*, 984 F.2d 1164, 1169 (Fed. Cir. 1993); *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1206 (Fed. Cir. 1991).

[46] Docket No. 113, at 5.

[47] *Id.*

[48] *Id.* at 7.

[49] *Id.* at 8.

[50] *Id.*

[51] *Price*, 988 F.2d at 1194.

9

over a patentee's rights is regarded with skepticism, and as a result, such inventor testimony must be supported by some type of corroborating evidence."[52]

Tanner further supports her claim with a declaration from Heather Morgan ("Morgan") and corresponding exhibits that purport to authenticate her claims. Morgan was hired by Tanner to work at Provo Craft and worked as a creative lead and, later, a product development lead.[53] Morgan states that she was present at the time Tanner conceived of her idea at the "tradeshow around October 2004" but noted that she "might be off by a month or so, either way" on the timing.[54] The Morgan and Tanner declarations include an early template of a keyboard outline dated February 4, 2005, that Tanner sent to Morgan as an example of a purported contemporaneous document to corroborate Tanner's inventorship.[55]

However, Cricut argues that it was Workman, not Tanner, who conceived the idea of the Cricut electronic cutting machines by early 2004 and had already begun taking steps to develop the idea by the time Tanner alleges to have conceived of it herself.[56] Cricut supports its timeline with declarations of the five inventors listed on the utility patents and their contemporaneous documentation of the invention process.[57]

Workman and the other inventors each confirm that that they were in the process of developing the electronic Cricut machine before Tanner claims to have conceived of the idea in

---

[52] *Id.* (citing *Mergenthaler v. Scudder*, 11 App. D.C. 264, 278–79 (D.C. Cir. 1897)); *see also Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 60 (1923); *Deering v. Winona Harvester Works*, 155 U.S. 286, 300–01 (1894); *Barbed Wire Patent*, 143 U.S. 275, 285 (1892)).

[53] Docket No. 115 ¶ 3–4.

[54] *Id.* ¶ 7.

[55] Docket No. 113, at 9–10.

[56] Docket No. 138 ¶¶ 2–13.

[57] *Id.* at 13.

October 2004.[58] Workman states that he began looking for ways to develop a small portable cutting machine by at least early 2004 and brought a Chinese sign cutting machine on which the system would be based to an in-person team meeting in September 2004.[59] Following the September 2004 meeting, Aaron Johnson, one of the team's inventors, created concept reports and drawings to reflect the team's ideas.[60] Phil Beffrey and Rodney Stock joined the team in October 2004 and confirmed that Aaron Johnson and Craig Youse had already sourced a machine from China.[61] In early December 2004, members of the project team presented the idea of the Cricut cutting system to Michaels craft store ("Michaels") in order to determine the efficacy of the project.[62]

Each inventor denies Tanner's involvement in the conception and product development of the electronic cutting machine and cartridge and confirms that Tanner's involvement was limited to design and artistic aspects of the cutting machine.[63]

Tanner was first listed as the Creative Lead on one of the concept reports dated January 4, 2005.[64] The earlier October 2004 concept documents, which included thorough descriptions and diagrams of the cutting machine's elements like the keyboard overlay that Tanner claims to have conceived, did not identify Tanner as a member of the development team.[65] The examples

---

[58] Docket Nos. 139, 140, 141, 142, 144.

[59] Docket No. 139 ¶ 9; Docket No. 141 ¶¶ 11–12.

[60] Docket No. 139-2. The first of these reports is dated October 8, 2004. Docket No. 139 ¶ 13.

[61] Docket No. 141 ¶ 11; Docket No. 142 ¶ 8.

[62] Docket No. 139 ¶¶ 17–18; Docket No. 140 ¶ 41.

[63] Docket No. 139 ¶¶ 19–20; Docket No. 140 ¶ 15; Docket No. 141 ¶ 26; Docket No. 142 ¶ 17; Docket No. 144 ¶¶ 10–11.

[64] Docket No. 139 ¶ 19; Docket No. 140 ¶¶ 45–47; Docket No. 140-11.

[65] Docket No. 140-3; Docket No. 140-4; Docket No. 140-5.

of keyboard overlays designed by Tanner are dated February of 2005, after her formal involvement on the development team commenced, well after Cricut's meeting with Michaels, and months after her own alleged date of conception.

While both parties acknowledge Tanner's involvement in the design and development of the cutting machine in her role as Creative Lead, those design contributions, that came much later in the development process, did not "contribute in some significant manner to the conception or [r]eduction to practice of the invention."[66] "[T]he picture painted by all of the evidence taken collectively"[67] indicates that Tanner has not carried her burden of showing by clear and convincing evidence that she played a role in its conception such that a correction of the patent inventorship is appropriate.

Based on the foregoing, the Court finds that (1) Tanner's claim is barred by patent laches; and (2) even if the claim was not barred by patent laches, Tanner has not shown by clear and convincing evidence she is entitled to a correction of patent inventorship.

### III. CONCLUSION

It is therefore

ORDERED that Defendant's Motion to Correct Patent Inventorship (Docket No. 113) is DENIED.

DATED this 13th day of May, 2024.

BY THE COURT:

_____
Ted Stewart
United States District Judge

---

[66] *Pro Mktg. Sales, Inc.*, 2021 WL 1987192, at *4 (citation omitted).
[67] *Price*, 988 F.2d at 1196.